UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

OCT 3 0 2014

PER_____
DEPUTY

_____ :
                             :
WILBY BARNETT,               :
                             :
          Plaintiff,         :
                             :          Civil Action No. 3:12-CV-1653
                             :
     v.                      :
                             :          (Judge Kosik)
                             :
UNITED STATES OF AMERICA,    :
                             :
          Defendant.         :
_____ :

## MEMORANDUM

Before this court is Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment. For the reasons which follow, the Court will grant Defendant's motion to dismiss as to Plaintiff's negligent construction claims, and grant Defendant's motion for summary judgment as to Plaintiff's negligent maintenance claims.

## I. PROCEDURAL HISTORY

Plaintiff filed a Complaint (Doc. 1), on August 21, 2012. After the parties completed discovery, Defendant filed a Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 20), a Statement of Material Facts ("SMF") (Doc. 21), and a brief in support of its motion (Doc. 22), on November 8, 2013. Plaintiff filed an Answer to SMF (Doc. 25), and a brief in opposition (Doc. 26), on December 30, 2013. Defendant filed a reply brief (Doc. 31), on February 14, 2014. The motion is ripe for disposition.

## II. FACTUAL BACKGROUND

On January 26, 2010, Plaintiff was driving south on Route 209, which is his normal commute to and from work. (Doc. 21, Def's SMF, at ¶¶ 1, 9.) At around 10:00 PM, Plaintiff hit

a patch of black ice at mile marker fourteen, and his car rolled over.  (Doc. , Ex. A, Bartlett Dep.,

at 14:3-10; 14:22-23; 23:5-14.)  As a result of the accident, Plaintiff sustained a broken neck, a

herniated disc, and associated pain.  (Id. at 62:1-5.)

On the night of the accident, the weather was cold, but there was no precipitation.  (Doc.

21, Def's SMF, at ¶ 14.)  It had rained the day before, and there was no snow on the day of the

accident.  (Id.)  Plaintiff recalled that the day before the accident, he was aware that it had rained

in the area where the accident occurred and that water ran across the road.  (Id. at ¶ 18.)

Route 209 was constructed by the state of Pennsylvania and transferred to the United

States in 1983.  (Id. at ¶ 30.)  The purpose of the transfer was to convert Route 209 from a

transportation corridor heavily used by commercial traffic, into a park road.  (Id.)  Route 209 runs

through the Pennsylvania side of the Delaware Water Gap National Recreation Center.  (Id. at ¶

29.)  The National Park Service ("NPS") Management Policies and the NPS Road Standards

1984 ("Standards") gives guidance to park superintendents, managers, planners, and designers.[1]

(NPS Management Policies 2006; 1984 NPS Park Road Standards.)

### III. STANDARD OF REVIEW

## A. Rule 12(b)(1) Standard

The United States's motion to dismiss is a factual attack on the basis of federal

jurisdiction.  In such cases, we are "entitled to independently evaluate the evidence to resolve

disputes over jurisdictional facts."  S.R.P. ex rel. Abunabba v. U.S., 676 F.3d 329, 332 (3d Cir.

2012).  "No presumption of truthfulness attaches to the allegations in plaintiff's complaint, and

the existence of disputed material facts does not preclude the court from evaluating for itself the

---

[1] www.nps.gov/policy/mp2006.pdf; www.nps.gov/DOrders/ParkRoadStandards.pdf.

merits of plaintiff's claim that a basis for federal jurisdiction exists." <u>Koch v. U.S.</u>, 814 F. Supp.

1221, 1226 (3d Cir. 1993). If a defendant supports its attack on jurisdiction with affidavits, a

plaintiff has the burden of responding to those facts. <u>Id</u>. If the "plaintiff's and the defendant's

sworn proofs raise a disputed issue of material fact, the court should permit the case to proceed to

trial in which the contested jurisdictional issues and the issues on the merits are both resolved."

<u>Id</u>. at 1226-27 (citing <u>Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.</u>, 673

F.2d 700, 712 (3d Cir. 1982)).

**B. Rule 56 Standard**

For claims over which we do have jurisdiction, we will construe the United States's

motion as a motion for summary judgment. Where "matters outside the pleadings are presented

to and not excluded by the court, the motions shall be treated as one for summary judgment and

disposed of as provided in Rule 56. Fed. R. Civ. P. 12(d). "When a motion to dismiss is

converted into a motion for summary judgment the parties must be given notice of the conversion

and an opportunity to present material to the court." <u>Latham v. U.S.</u>, 306 F. App'x 716, 718 (3d

Cir. 2009); <u>see also</u> <u>Rose v. Bartle</u>, 871 F.2d 331, 342 (3d Cir. 1989). The Third Circuit has held

that filing a motion to dismiss, or in the alternative, a motion for summary judgment is sufficient

"to place the parties on notice that summary judgment might be entered." <u>Hilfirty v. Shipman</u>,

91 F.3d 573, 578-79 (3d Cir. 1996)

## IV. DISCUSSION

Defendant's motion is based principally on three alternative grounds: (1) the discretionary

function exception to the Federal Torts Claim Act ("FTCA"), 28 U.S.C. § 2671 *et seq*, bars

Plaintiff's claim; (2) Pennsylvania's Recreational Use of Land and Water Act ("RULWA"), 68

P.S. § 477-1 - 477-8, bars Plaintiff's claim under the FTCA; and (3) Plaintiff cannot establish the negligence of the United States.

## A. Discretionary Function Exception

The government argues that the court does not have subject matter jurisdiction, since it is immune from suit under the discretionary function exception to the FTCA.  Under the FTCA, the United States partially waives sovereign immunity for:

> claims . . . for money damages . . ., for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  An exception to this waiver of sovereign immunity, is the discretionary function exception, which gives the government immunity from:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved abuse.

28 U.S.C. § 2680(a).  The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).

## B. Application of the Discretionary Function Exception

Plaintiff bears the "burden of establishing that his claims fall within the scope of the FTCA's waiver of the federal government's sovereign immunity (i.e., that the requirements of 28 U.S.C. § 1346(b)(1) are met) . . . ." Abunabba, 676 F.3d at 333.  The Court of Appeals for the

4

Third Circuit has held that the Government has the burden of proving the applicability of the discretionary function exception. See id, note 2 (discussing U.S. v. Gaubert, 499 U.S. 315 (1991), and finding that placing the burden on the Government is consistent with Gaubert).

As a threshold matter, a court must identify the conduct at issue. Id. at 332. Then, the court must apply a two-pronged test set forth in Gaubert. See Merando v. U.S., 517 F.3d 160, 164 (3d Cir. 2008). "First, a court must determine whether the act giving rise to the alleged injury and thus the suit involved an 'element of judgment or choice.'" Id. (citing Gaubert, 499 U.S. at 322). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" Id. (quoting Gaubert, 499 U.S. at 322).

Second, even if the challenged conduct involves an element of judgment or choice, the second prong of the Gaubert test requires the court to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . the exception protects only governmental actions and decisions based on considerations of public policy." Abunabba, 676 F.3d at 333 (quoting Gaubert, 499 U.S. at 323). The focus of the inquiry is on the "nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325.

## 1. The Challenged Government Conduct

Before we undergo the two-part inquiry to determine whether the discretionary function

5

exception applies, we must first identify the conduct at issue.  See generally Merando, 517 F.3d at 165-168.  Plaintiff contends that the challenged conduct is two-fold: (1) the Government's failure to construct Route 209, which is part of and runs through the Delaware Water Gap National Recreation Area, in a way to provide for adequate ditches so as to prevent black ice; and (2) the Government's failure to properly maintain Route 209 to the standards to which they have been constructed, and in a condition that promotes safety, including the use of plow trucks, salt, cinders, and caution devices, on the night of the accident.

**2. First Gaubert Prong**

We next determine whether the conduct involved an "element of judgment or choice." Gaubert, 499 at 322.  In doing so, we consider whether there is a relevant statute, regulation, or policy that required NPS to construct and/or maintain Route 209 in a way that provides for adequate ditches, or maintain the ditches, to the standards in which they were constructed and in a way that promotes safety, or whether the Government's actions were discretionary.  Since the conduct in question is two-fold, we will discuss each in turn.

**i. Construction of Route 209**

We first consider whether the construction of Route 209 involved an "element of judgment or choice."  The Government argues that the Standards, adopted in 1984, do not apply to Route 209 in regards to construction, since the Standards were adopted a year after Route 209 was constructed.  The Government asserts that Route 209 was constructed by the State of Pennsylvania in 1983, and there has been no construction or reconstruction on Route 209 in the area of the accident at mile marker fourteen.

Plaintiff argues that the discretionary function exception does not apply because the

Standards are applicable to Route 209 in terms of construction.  Plaintiff points to the Roadside

Slopes and Drainage Section, which starts off by stating, "Where terrain conditions and park

resources permit, backslopes, foreslopes, and roadside drainage channels should have gentle,

well-rounded transitions which will be achieved through slope rounding."  Standards, at 32.  It

goes on to state,

> Cut sections should be designed to provide for adequate ditches or other drainage
> features to ensure positive drainage.  The ditch must be large enough to
> accommodate the design flows and deep enough to provide for satisfactory drainage
> of the pavement base.  In appropriate cases, underdrains should be used to lessen
> impacts.

Id.  Plaintiff argues that this language provides mandatory requirements for maintenance of the

roads, and provides an expert report of a professional engineer, James C. Schultz, that concludes

that the NPS fell short of the Standards' requirements.  (Doc. 26, Pl.'s Br. in Opp., Ex. A,

Schultz Rpt.)

We agree with the Government that, since Route 209 was constructed in 1983 by the

State of Pennsylvania, the Standards, adopted in 1984, would not apply to the construction of the

road.  Additionally, we find that the Standards give discretion to NPS for decisions to reconstruct

existing roadways, as evidenced by the Preface of the Standards.  The Preface states,

> The standards contained herein provide flexibility in the planning and design
> processes to allow for consideration of variations in types and intensities of park use,
> for wide differences in terrain and climatic conditions, and for protection of natural
> and cultural resources in National Park System areas.

> It is important to note that the standards vary considerably with the type of use to be
> accommodated.  Basic decisions will have to be made by park management in the
> application of these standards based on careful examinations of the desired use levels
> to be allowed considering impacts on visitor use and resource protection in
> conformance with legislative mandates.

> The criteria presented have been adapted from available design standards to meet the
> unique requirements of park roads. This will provide a framework within which
> design and construction of park roads should be conducted; however, this document
> is not intended to encompass a level of detail comparable to that normally found in
> design manuals.

Standards, at i. The Preface also states, "On resurfacing, restoration and rehabilitation (3-R)

projects they will be utilized to the *extent practicable and feasible*." Id. (emphasis added). We

find that the language of the Preface gives NPS discretion, since it does not prescribe a specific

course of action for NPS to decide when to reconstruct roads. Since the Standards were not

applicable at the time Route 209 was constructed, and Route 209 at mile marker fourteen was

never reconstructed, we find that the Government had discretion in choosing when and whether

to reconstruct the drainage ditches alongside Route 209.[2]

Additionally, the Park Roads Section of the Management Policies of 2006, shows that the

Standards give discretion, as to the design of park roads, which include existing park roads that

do not meet current engineering standards. Specifically, the Park Road Section states,

> Park road designs are subject to NPS Park Road Standards, which are adaptable to
> each park's unique character and resource limitations. Although some existing roads
> do not meet current engineering standards, they may be important cultural resources
> whose values can and should be preserved with attention to visitor safety.

Management Policies, at § 9.2.1.1.

## ii. Maintenance of Route 209

We next consider whether the maintenance of the roadside ditches along Route 209

involved an element of judgment or choice. This challenged conduct also includes maintaining

---

[2] The Roadside Slopes and Drainage Section of the Standards "contains requirements for the *design* of drainage systems and does not speak to the inspection, maintenance, or repair thereof." Quigley v. United States, 927 F. Supp. 2d 213, 222 (D. Md. 2012) (finding sections inapplicable to a claim for negligent maintenance of roadside ditches) (emphasis in original).

8

Route 209 in a condition that promotes safety, which includes employing safety devices such as salt, cinders, and caution devices.

Plaintiff sets forth the argument that since the nature of the conduct in question was made at the "operational level" and not the "policy making level," the first prong of the discretionary function exception cannot be met. Although we agree that the nature of the decision involved is the primary consideration, we will not make a distinction based on the level at which the decision was made. See Cope v. Scott, 45 F. 3d 445, 449-50 (D.C. Cir. 1995) (rejecting a similar argument). The United States Supreme Court in Gaubert, found that the Fifth Circuit "erred in holding that the exception does not reach decisions made at the operation or management level . . . ." Gaubert, 499 U.S. at 325. Therefore, our inquiry is whether the decision was susceptible to policy considerations, regardless of the level at which the decision was made.

The Government argues that NPS has the discretion, by way of the Standards and the Management Policies 2006 manual, to determine what safety measures to employ at certain locations, and that these determinations require NPS to make policy judgments by balancing competing considerations. The Government points to the safety policy set forth in the Management Policies 2006 manual, and argues that it does not set forth specific standards regarding the installation of safety devices:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary – and very substantial – constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent they will not impair park resources and values . . . .
>
> These management policies do not impose park specific visitor safety precautions. The means by which public safety concerns are to be addressed is left to the decision

9

of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting . . . close roads and trails or install guardrails – such as fences, railings and paved walking surfaces – typically found in other public venues may not be appropriate in a national park setting.

Management Policies, at § 8.2.5.1.

Plaintiff responds by arguing that the Roadside Slopes and Drainage Section and the

Maintenance Section of the Standards do not give the NPS discretion in maintaining its roads.

Specifically, the referenced paragraph in the Maintenance Section states,

Road safety and efficiency of operation depend on adequate levels of cyclic and preventative maintenance and repair, which are also essential to protect the Service's extensive capital investment in the physical facility constituted by park roads, parkways and bridges. Consequently, park roads shall be maintained to the standards to which they have been constructed or reconstructed, and in a condition that promotes safety and protects capital investment.

See Standards, at 37. Plaintiff argues that this section does not give NPS discretion, as the roads

"*shall* be maintained to the standards to which they have been constructed or reconstructed, and

in a condition that promotes safety and protects capital investment." Id. (emphasis added).

Plaintiff asserts that this maintenance includes fixing the roadside ditches and employing safety

devices on the date of the accident.

A traffic study of Route 209 was conducted in 2009, upon which repairs were

subsequently undertaken. The repairs included signage replaced on Route 209, various areas

overlaid with new pavement, and some passing areas removed.[3] (Doc. 26, Pl.'s Br. in Opp., Ex.

B, Donahue Dep., at 43:14-18.) The Superintendent of the Delaware Water Gap Recreation

Area, John Donahue, declared that "deepening the earthen ditches along Route 209 is a major

---

[3] Neither party asserts that the repair of the roadside ditches was recommended.

construction and repair issue and is not correctable by 'garden variety maintenance.'" (Doc. 21, Def.'s SMF, Ex. B, Donahue Decl., at ¶ 16.) Additionally, the determination of the priority of road repairs and redesigns is within the discretion of the NPS. See Mitchell v. United States, 225 F.3d 361, 364 (3d Cir. 2000) (finding that NPS's decision about how and when to reconstruct Route 209 was discretionary). We find that the repair of the roadside ditches, which would be considered a reconstruction project, was within the discretion of NPS, thereby meeting the first Gaubert prong.

Plaintiff also argues that NPS should have cleared the roadway of black ice on January 26, 2010, to save human life and promote safety. Although the Standards and the Management Policies of 2006 do speak to safety, neither gives the type of direction to NPS so that "the employee has no rightful option but to adhere to the directive," Gaubert, 499 U.S. at 322, when responding to wintry conditions. We find that the maintenance of Route 209 with regards to responding to wintry conditions, was within the discretion of NPS, thereby meeting the first Gaubert prong.

## 3. Second Gaubert Prong

We must next determine whether the discretionary act is the kind the discretionary function exception was designed to shield. Id. at 322-23. Only decisions "susceptible to policy analysis" are protected by the exception. Id. at 325. "The Government must establish that the challenged conduct is 'grounded in the policy of the regulatory regime,' and 'based on the purposes that the . . . regime seeks to accomplish,' Id. at 325 & n. 7. In other words, there must be a 'rational nexus' between the Government's decision and 'social, economic, and political concerns.'" Abunabba, 676 F.3d at 336 (quoting Cestonaro v. U.S., 211 F.3d 749, 755 n. 4 (3d

Cir. 2000)).

### i. Construction of Route 209

Under the second prong, we first consider whether the construction of Route 209 is the kind of discretion that implicates "social, economic, or political" judgment. Id. at 325. The construction and reconstruction of park roads have consistently been held to be the type of decisions susceptible to policy analysis. For example, in Mitchell, the Third Circuit found that in determining priority of road repairs and redesigns, "the government must weigh social, economic and political policy." Mitchell, 225 F.3d at 364. In Mitchell, a study of Route 209 was conducted shortly after NPS inherited the road from Pennsylvania in 1983. Id. at 365. The court found that the study revealed numerous design and safety issues, and that NPS had to consider "the ultimate purpose of the road, whether it would continue as a major commercial through-road or whether its use would be scaled back to serve principally as a recreational road." Id. As a result, the court found that the decision not to reconstruct all of the drainage ditches along Route 209, was the type of decision susceptible to policy analysis. Id. at 366.

Similarly, we find that in this case, the decision of whether to reconstruct the drainage ditches along Route 209 was susceptible to policy analysis. Superintendent Donahue declared that since "the task of digging out and regrading of these earthen ditches would be a major project," it would be a reconstruction, "heavily influenced by limitations on financial resources and other policy consideration." (Doc. 21, Def.'s SMF, Ex. B, Donahue Decl., at ¶ 11.) We find that the discretionary function exception applies to NPS's decision not to reconstruct the drainage ditches along Route 209; therefore, we do not have subject matter jurisdiction over Plaintiff's claim of negligent construction or reconstruction.

**ii. Maintenance of Route 209**

We next consider whether the maintenance of Route 209 is the kind of discretion that implicates "social, economic, or political" judgment. Abunabba, 676 F.3d at 325. Since we have already found that the repair of the roadside drainage ditches would be considered a reconstruction project, as they were not correctable by "garden variety maintenance," we focus our inquiry on maintaining Route 209 in a condition that promotes safety. The relevant inquiry therefore, is whether the use of safety measures, which includes the use of salt, cinders, and caution devices, is the type of decision Congress intended to protect by way of the discretionary function exception. The onus is on the Government to show there is a "'rational nexus' between the Government's decision and 'social, economic, and political concerns.'" Id. at 336 (quoting Cestonaro, 211 F.3d at 759).

The Government gives general arguments as to the balancing of the competing interests with respect to employing safety measures on park roads. The Government argues that the decision to employ safety devices involves the balancing of competing interests, such as resource allocation, visitor safety, aesthetics, funding, and resource protection, but does not go into any specifics regarding the use of safety devices during wintry conditions.

In response, Plaintiff asserts that there were no budgetary concerns in terms of work required to keep the roadway safe for vehicular and pedestrian traffic. (Doc. 26, Pl.'s Br. in Opp., Ex. B, Donahue Decl., at 29:2-6.) Plaintiff points out that on the night of the accident, NPS had plow trucks, salt, cinders, and caution devices readily available for use, and without budgetary concerns. (Id. at 19:24-21:21; 22:23-23:9; 29:2-19.)

Superintendent Donahue stated in his deposition that NPS does "whatever is necessary"

13

to keep Route 209 open, and gives no suggestion that he or the chief of maintenance, considers

any social, economic, or political concerns.  Specifically, Superintendent Donahue's deposition

testimony included:

> Q:    Would the discretion that the chief of maintenance possesses to determine whether maintenance staff should work beyond their normal shift have anything to do with budgetary concerns in the event of a potential storm event?
>
> A:    Not really.
>
> Q:    Well, you say, "Not really," that leads me to believe that there might be some budgetary involvement.
>
> A:    We have the restriction of the number of employees that we have which is related to budget.
>
> Q:    Okay.
>
> A:    But we basically do whatever it takes when we respond to a snowstorm.
>
> Q:    That's what I thought you were going to say.  There would be no budgetary concerns in terms of keeping the roadways safe for vehicular or pedestrian traffic; is that true?
>
> A:    Yes, it's true.  My direction is to do whatever is necessary to keep Route 209 open.
>
> Q:    And you passed that along to the deputies and the others that work under you, correct?
>
> A:    Yes.

(Id. at 14:15-15:14.)  Additionally, when Superintendent Donahue was asked during the

deposition, whether the dump trucks equipped with plows and spreaders and pickup trucks

located at the park, could be used by the maintenance staff without budgetary concerns, if

necessary to keep Route 209 open, Donahue answered, "Yes."  (Id. at 29:2-6.)

The Tenth Circuit noted that "when the Park Service balances safety considerations against the interest in preserving the natural environment, that decision is grounded in policy." Id. (citing Zumwalt v. U.S., 928 F.2d 951, 955 (10th Cir. 1991)).  Some courts have also focused on whether there was a deliberate balancing of risks and costs.  See Fed. Bus. Ctrs., Inc. v. U.S., No. 12-CV-7099-WJM-MF, 2014 WL 3514424 (D.N.J. Jul. 15, 2014) (finding that the government failed to demonstrate that it weighed the cost of repair against the risk of harm, which is a "key characteristic of a policy-based decision," when it failed to remedy a condition on a parcel of land that damaged the plaintiff's land).

As a result, courts have taken various positions on whether decisions to employ safety devices is the type of discretion the discretionary function exception was designed to protect. Compare Autery v. U.S., 992 F.2d 1523 (11th Cir. 1993) (holding that decisions made by park personnel in designing and implementing an unwritten tree inspection program fall within the discretionary function exception); Miller v. U.S., 642 F. Supp. 2d 437 (M.D. Pa. 2009) (holding that the decision not to provide signs warning of potential hazards near commemorative monuments is susceptible to policy analysis); Abunabba, 676 F.3d 329 (holding that the decision not to warn against shoreline barracuda attacks was within the exception, because NPS had to weigh the benefits of additional warning signs against the costs of such warnings); with  Gotha v. U.S., 115 F.3d 176 (3d Cir. 1997) (holding that the exception did not apply to the Navy's failure to provide safeguards on a footpath because it was a "mundane, administrative, garden-variety, housekeeping problem" far removed from the policies of the Navy's mission); Cope, 45 F.3d at 451 (finding that the government's failure to post warning signs of dangerous road conditions was outside the exception).

15

Both parties discuss <u>Mitchell</u>, where the Third Circuit held that the discretionary function exception applied to the challenged conduct of NPS's choice not to repair or improve a drainage ditch and a concrete head-wall located five feet west of a paved roadway. <u>Mitchell</u>, 225 F.3d at 362. The court compared the case to a previous case, <u>Gotha v. United States</u>, where the Third Circuit found that the discretionary function exception did not apply because "the government failed to articulate a public policy rationale – military, social or economic consideration – that factored into its decision not to rebuild the stairway or install a handrail." <u>Id</u>. at 365 (citing <u>Gotha</u>, 115 F.3d at 181-82). In <u>Mitchell</u>, the court found that, unlike <u>Gotha</u>, NPS articulated several policy considerations that implicated its decision not to reconstruct all of the drainage ditches along Route 209. <u>Id</u>. at 366.

Although the appropriate inquiry is whether the challenged conduct is susceptible to policy analysis and the purpose of the discretionary function exception is to prevent judicial "second-guessing" of "legislative and administrative decisions grounded in social, economic, and political policy," <u>Gotha</u>, 115 F.3d at 179 (quoting <u>Varig Airlines</u>, 467 U.S. 797, 814 (1984)), the Government must still meet its burden. To meet its burden, the Government does not have to show that it "actually considered each possible alternative in the universe of options," but it must show that "the conduct was of the type associated with the exercise of official discretion." <u>Id</u>. at 180. The susceptibility analysis "is not a toothless standard that the government can satisfy merely by associating a decision with a regulatory concern." <u>Cestonaro</u>, 211 F.3d at 755.

Here, we find that the Government has not met its burden with respect to employing safety devices, on the night of Plaintiff's accident. The Government did not show that the decision to employ safety devices to Route 209 in the area of mile marker fourteen, was

16

"susceptible to policy analysis," since there was no "rational nexus" between the decision and "social, economic, and political concerns." Although the Government argues that park managers must balance visitor safety, aesthetics, resource protection, and funding, Superintendent Donahue made clear in his deposition, that when working to keep Route 209 open during winter conditions, NPS does "whatever is necessary," and that there are no budgetary concerns.

We find that the Government's decision on the use of safety measures, including the use of salt, cinders, and caution devices, on January 26, 2010, falls outside the protection of the discretionary function exception. Therefore, we do have jurisdiction over Plaintiff's claim of negligent maintenance of Route 209, with respect to employing safety devices.

## C. Negligent Maintenance Claim

We construe Defendant's motion as to the merits of Plaintiff's negligent maintenance claim, as a motion for summary judgment, since we are asked to consider evidence outside of the pleadings. A party seeking summary judgment always bears the initial burden of informing the court of the basis of its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). It then follows that summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

To establish a claim of negligence under Pennsylvania law, a plaintiff must show: "(1) a duty or obligation recognized by law, requiring the defendant to conform to a standard of conduct; (2) the defendant's failure to conform to that duty, or breach; (3) a causal connection between the defendant's breach and the plaintiff's injury; and (4) actual loss or damage by the plaintiff." Cavanagh v. Electrolux Home Products, 904 F. Supp. 2d 426, 429 (E.D. Pa. 2012) (citing Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002)).

Under Pennsylvania law, the owner or occupier of land is subject to liability to an invitee, if he or she:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to invitee;
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Gervasio v. Chelsea Pocono Finance, LLC, et al., Civ. Action No. 3:10-2430, 2013 WL 5603575, * 3 (M.D. Pa. Oct. 10, 2013) (citing Restatement (Second) of Torts § 343); see Updyke v. BP Oil Co., 717 A.2d 546, 549 (Pa. Super. 1998). "Further, the plaintiff must present sufficient evidence to show: (1) the defendant knew or, by using reasonable care, should have known of a dangerous condition; and (2) the defendant helped to create a harmful condition or had actual or constructive notice of the dangerous condition." Gervasio, 2013 WL 5603575 at *3 (citing Zito v. Merit Outlet Stores, 647 A.2d 573, 575 (Pa. Super. 1994)).

The Government argues that Plaintiff cannot establish a claim of negligence because Plaintiff failed to produce any evidence that the United States had actually or constructive notice

of any dangerous condition at or near the site of the accident.  In response, Plaintiff argues that

the Government was aware of the recurrence of black ice on Route 209, as evidenced by Ranger

Michael Fernalld's deposition testimony.

In Tameru v. W-Franklin L.P., 350 F. App'x 737 (3d Cir. 2009), the Third Circuit found

that summary judgment should be entered in favor of the hotel defendant when the plaintiff, who

slipped on black ice at the entrance of the hotel, failed to produce evidence of actual or

constructive notice that icy conditions developed at the site of the fall.  A plaintiff may present

"sufficient circumstantial evidence to show that a defect 'had [existed] long enough so that in the

exercise of reasonable care the defendant's employees should have discovered and removed it.'"

Gervasio, 2013 WL 5603575 at * 4 (quoting Rumsey v. Great Atlantic & Pac. Tea Co., 408 F.2d

89, 91 (3d Cir. 1969) (applying Pennsylvania law)).  Weather conditions at the time of the

accident alone cannot infer constructive notice.  Id.  (citing Tameru, 350 F. App'x at 740).

Rather, "constructive knowledge may be inferred when the defendant knows 'of both the weather

condition at the time of the accident and the fact that the weather condition created hazards on

the premise.'"  Id. (citing Tameru, 350 F. App'x at 740).

It is undisputed that on the day of the accident, there was no precipitation.  It is also

undisputed that the day before the accident, it had rained, and Plaintiff noticed water running

onto the road in the area of the accident.  Since there is no dispute as to whether the Government

was aware of the weather conditions on the night of January 26, 2010, we next consider whether

the Government, having knowledge of the weather conditions, knew those conditions created a

hazard at the site of the accident, mile marker fourteen on Route 209.

The deposition testimony of Ranger Fernalld shows that although he was aware of black

19

ice forming on the twenty-two miles of Route 209, based upon his knowledge of the roadway

over the past twenty-three years, there was no particular area of Route 209 that he would patrol

for black ice.  (Doc. 26, Pl.'s Br. in Opp., Ex. C, Fernalld Dep., at 19:11-19; 20:5-16.)  Ranger

Fernalld's deposition testimony concerning his knowledge of black ice forming, went on to state:

> Q:     Did [black ice forming on certain areas of the roadway of Route 209 within
>        the park] occur even in absence of a snow event?
>
> A:     Yes.
>
> Q:     Did that occur even in the absence of precipitation?
>
> A:     No.  To the best of my knowledge, it was always preceded with some sort of
>        precipitation.
>
> Q:     It was always preceded with some form of precipitation to the best of your
>        knowledge?
>
> A:     Correct.

(Id. at 19:19-20:4.)

Superintendent Donahue was also not aware of black ice forming, either on a regular or

irregular basis prior to the accident, at the specific location of mile marker fourteen on Route

209.  (Id., Ex. B, Donahue Dep., at 35:12-22.)  Superintendent Donahue further testified on his

knowledge of black ice forming on Route 209 as follows:

> Q:     Were you aware of that occurring at other locations on Route 209?
>
> A:     Black ice occurs sporadically and spontaneously on roads.  It's impossible to
>        predict where and when.
>
> Q:     I'm not asking about all roads though, I'm asking you as a superintendant (*sic*)
>        about the main artery of your park, Route 209, if prior to January 26th of
>        2010[,] if you were aware of black ice occurring?
>
> A:     It occurs.

Q:     Okay.  Were you aware of it occurring prior to January 26, 2010?

A:     Yes.

(Id. at 35:23-36:11.)

Although the Government was aware of black ice forming generally on the twenty-two miles of Route 209, it was not aware of black ice forming at the area of the accident, which is the focus of our inquiry.  Plaintiff has not made a sufficient showing that the Government had notice of black ice at mile marker fourteen of Route 209.  Plaintiff has also not made a sufficient showing that the Government knew that the weather conditions on the night of the accident, created black ice at mile marker fourteen.  We find that Plaintiff, the non-moving party, has failed to rebut by making a factual showing sufficient to establish the existence of notice, an element essential to his case, and on which he will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  Therefore, in viewing the evidence in the light most favorable to the Plaintiff, we find that the Government is entitled to a judgment as a matter of law as to Plaintiff's negligent maintenance claim.

## V. Conclusion

For the reasons set forth above, we will grant Defendant's motion to dismiss for lack of subject matter jurisdiction as to Plaintiff's claim for negligent construction or reconstruction of Route 209.  We will also grant Defendant's motion for summary judgment as to Plaintiff's claim for negligent maintenance of Route 209.  An appropriate order is attached.